Our next case for argument is 23-1475, Apple v. Gesture. Ms. Boswick, please proceed. Thank you, Your Honor. May it please the Court. The board properly held nearly all of the claims. Can I ask you about that, just as a preliminary housekeeping thing? There's an overlap between, you weren't counsel, but on the case we just heard, there's an overlap of claims. So can you just give me the numbers and tell me, this is broad, this includes more than the first, right? But does it include the entirety of the first appeal? Yes, Your Honor. So there are 31 claims in the 431 patent. In our case, the board held unpatentable 29 of those 31. It upheld the patentability of claims 11 and 13, which is the subject of Apple's appeal. In the unified appeal, only the independent claim 7 claims are at issue there. That's the apparatus claim as opposed to the two sets of methods claims. But that's part of the cross appeal here? It is, Your Honor. I can get into details about sort of how each of them affects each other. I think the key points to understand are, the court has to address our appeal regardless of the outcome of the unified appeal because claims 11 and 13 were upheld in the unified proceeding and unified has not challenged those on appeal. There are, however, parts of our defense, our response to gesture technologies cross appeal that the court would not have to decide here depending on how the unified appeal comes out, if that is helpful. And so I'll explain in my rebuttal why gesture technologies cross appeal arguments are meritless. As to those two remaining claims, claims 11 and 13, the board legally erred by considering only whether Numizaki states that the TV telephone of its fifth embodiment is a cellular phone without considering what both the board and gesture technology had previously acknowledged was Apple's argument, namely that a person of ordinary skill would have understood that Numizaki's fifth embodiment is directed to problems that particularly affected cellular video phones at the time and therefore that a cellular phone implementation was obvious in view of the TV telephone disclosure combined with the knowledge of a person of ordinary skill in the art. Gesture technology has never disputed that key point which forms the core of Apple's obviousness case. Indeed, gesture technology primarily asks this court not even to consider the merits of Apple's argument, focusing instead on an estoppel theory that is both inexcusably forfeited and unsupported by any factual basis. If we look at the merits, it's clear that while the board understood Apple's argument at the hearing, in its final written decision, it addressed only an anticipation theory, not the obviousness argument that it had recognized Apple was making. If we look at Appendix 518, this is from the hearing transcript, and this is where in colloquy with Gesture Technology's counsel, Judge Dugal, who ended up authoring the final written decision, characterizes Apple's argument. He says it is, that the argument is that, quote, a person of ordinary skill would have understood that Numizaki's focus on lower communication costs is a concern applicable to cellular phones. He goes on to recite our expert's testimony that it was a concern uniquely applicable to cellular phones and not other types of wireless or wired connections. He says, you know, that's, so it seems like that's petitioner's main support. That issue is not addressed in the final written decision at Appendix 31 to 32. The board simply never analyzed what it had recognized was Apple's argument, and I think for that reason a- What page was that hearing on? That, I was quoting from Appendix 518, Your Honor, and it starts at line 2. And this is from the oral argument? That's from the oral argument, and what he's quoting from there is our expert Dr. Bederson's testimony, his declaration at Appendix 907 to 908, in support of the argument that Apple made in its petition at Appendix 167 that likewise discusses what a person of ordinary skill would have understood about Numizaki's fifth embodiment and its focus on communication costs. If I remember correctly, in your brief, you say that maybe the board misunderstood the reliance on that newspaper article as well, right? Is it a newspaper article? I think they did, Your Honor. That's from your Times article. I have a problem with that, so I wanted to ask you about it. So the reason why is that I see on page A906, your expert specifically said that a person of ordinary skill in the art would have understood that the conference support system is more commonly referred to as a videoconference system, and videoconference telephones send video. Wait, wait. I'm sorry. Such videoconference telephones were also known as cellular videophones, and that incites that article. Correct. And so it seems to me this is a problem that the expert made. That piece of it, the board rejected that statement in Dr. Bederson's testimony, sort of equating, essentially opining that these two terms are synonymous. We're not challenging that. What the board failed to address was the rest of Dr. Bederson's testimony that goes on at 907 and 908 about why a person of ordinary skill in the art, he talks about this focus on communications costs of being specifically applicable to cellular videophones. And he says for that reason, a person of ordinary skill in the art, reading Numizaki's TV telephone embodiment, which specifically calls out communication costs as a reason for implementing it that way, he says a person of ordinary skill in the art would have understood it to be a cellular videophone. And where he uses the New York Times article there is to say, yes, okay, cellular videophones were not prevalent at the time in the marketplace, but they were being introduced commercially. You have the Kyocera phone in the New York Times article that is about to be introduced commercially, and so obviously researchers have been working on it up to that time. And so he says that even though they weren't common in the market, a person of ordinary skill would have known about them, supporting his primary opinion that it's this focus, this common focus on communications costs. Well, there's nothing in the article that says specifically you're going to, there's nothing in the part of the patent that refers to cellular, and this article doesn't include a videoconference to cellular videophones. So why isn't that enough to respond to that argument? Because they didn't, they responded to part of their argument, right? They responded to the part that says these two terms are synonymous. Again, fine, we're not challenging that on appeal. They didn't respond to the substance of his argument, and what the board had recognized at Appendix 518 was the main support for our obviousness argument, which was this common focus on communication costs. I think that's it.  Right. You could respond to an inference by saying, well, that's an inference, but this is the fact. But they didn't, they simply haven't analyzed this. There's nothing in that discussion at Appendix 31 to 32 that addresses our communication cost point, which, again, was undisputed by gesture technology. They have never at the board or here disputed that communication costs are a concern that drives the fifth embodiment of Numizaki or that communication costs were specifically and uniquely applicable to cellular videophones at the time. But you also made the point, and you just referred to it, that cell phones were not prevalent at the time, and that seems to hurt you rather than help you. Not prevalent in the marketplace, Your Honor, and that's the reason why Dr. Peterson had to introduce the New York Times article as a show. Yes, they weren't prevalent in the marketplace, but again, by the time that you have one being introduced commercially, a cellular videophone being introduced commercially at the same time as the 431 patent, two years after Numizaki, and so what he's trying to establish is that, and what he opines, is that that means that researchers were really focused at the time, and he describes how, and this is at Appendix 907 to 908, he talks about the fact that at 908, a FAUCETA would have understood that Numizaki's fifth embodiment is directed to improvements to make such cellular videophones commercially viable. So right at the time that they are hitting the market, you have this technology that's going to help facilitate that process. What about the statement that the petition includes no analysis regarding whether the transmission functionality is equivalent of a wireless cellular transceiver? So, I mean, like, even if there's some documents that say, or some newspaper article that says these are prevalent, I mean, there's nothing that says it's equivalent. So isn't that responsive? I apologize, Your Honor. The equivalence analysis there, I believe, is the 112F equivalence analysis. Claim 11 is a means-plus-function claim, and so if we were arguing anticipation, we would have to show that Numizaki discloses the cellular transceiver or its equivalent. I believe that's the equivalence analysis that the Board is referring to there, and certainly we didn't make that argument in the petition, because we weren't arguing... You were showing obviousness as well. We don't have to show that it's disclosed, right? And so the obviousness argument for Claims 11 and 13 was that... Well, you don't have to show that it's disclosed, but there was no, it would have been obvious to replace the video phone with the cellular phone argument. Was there in the petition? Because I looked at it, and I didn't see that. Because it's not about replacing. It's about, again, what a person with a primary skill in the art... A person with a primary skill in the art reading this prior reference would understand it to disclose cellular. Or cellular just. The original reference doesn't say cellular whatsoever. And no statement, which could have been done, which would have said, hey, the prior art doesn't teach cellular, but cellular would have been known. Here's the secondary reference that teaches it. So here's the reason to modify it. So you're not relying on that. Not a modification at all. What I'm relying on is the argument in the petition of Appendix 167, supported by Dr. Bederson at Appendix 907 to 908, that talks about the background knowledge of persons with ordinary skill. I think it's the same analysis as in the real-time data case that we've cited, where it was a single reference, obvious in this case. You have the O'Brien reference. Didn't mention dictionary encoding. Talked about string encoding. And the argument was, yes, but here's this other reference, Nelson, that talks about... that demonstrates why a person of ordinary skill would have understood the two to be equivalent. Or would have understood the reference in O'Brien to be a form of dictionary encoding. And what this court said was, you didn't have to show a motivation to combine those two. You're not arguing about a modification. The question here is whether the board said enough for us to understand them to be saying, we don't buy the argument that this prior reference teaches cellular to a person of ordinary skill here. And I think without... Yes, and I think without discussing the issue of communication costs at all, which the board had previously... That's a rescand argument, though, right? You've asked for a reversal. That would be... The most you could get is a remand for the board to then discuss why it doesn't agree with you on the low-cost communication. We've addressed why a reversal would be appropriate. We've also asked for a remand at a minimum. Yes, Your Honor. I'll save the remaining time for that. Thank you. Mr. Wittensauer, please come on back up. Thank you, Your Honor. May it please the Court. On the substance of Claims 11 and 13, one thing that struck out to me in preparation was that neither of Apple's briefs contained the word burden. And I think that underlies some of the arguments that we've seen today. Everyone agrees that Apple's argument was understood by the board and gesture. But Apple's argument simply was not supported by the evidence. Dr. Betterson's reliance on the article was... What is your best argument for why you think the board addressed their nuanced argument about how, you know, there was some sort of financial suggestion that a person of ordinary skill in the art would understand applies to cellular and that there's another reference that teaches that cellular videophones were in existence. So, Your Honor, I think it starts with, and Apple's criticism starts with the fact that the word necessarily was used at different times during the proceeding, whether it be the oral argument or even in the final written decision. Now, Apple points to that as evidence that the board applied the wrong standard. But it actually comes from Dr. Betterson's own supplemental declaration. On Appendix 1135, he titled his discussion of his opinions pertaining to the cellular transceiver as, quote, my apologies, Your Honor, Numazaki's fifth embodiment would have necessarily transmitted information using a cellular transceiver. And that's addressing his additional supplemental declaration that he put in when it was made clear by both GTP's expert and the board's institution decision that the argument as to Claims 11 and 13 simply did not, wasn't backed by evidence. Do you understand Apple's petition to be arguing that Numazaki disclosed a cell phone? Numazaki suggested a cell phone when they used the word TV telephone, a word which made me actually giggle. I was thinking, gosh, is this because it's a Japanese-translated American patent? What the heck were they going for? What the hell is a TV, sorry. What's TV telephone? Is it like a person on TV holding a telephone? I mean, I think it's video conferencing is the concept. But anyway, it caused me some amusement when I read the patent because I was like, wow, there's a lot of words in here that don't make sense and I'm thinking something might be lost in the translation of this one. But in any event, do you think that, let me go back to my question, do you believe Apple's petition argued that the word TV telephone means cell phone, that the word TV telephone suggests cell phone, or that a cell phone would be an obvious substitute for a TV telephone, which is what is disclosed in Numazaki? What do you think is the scope of their patent? So, Your Honor. And the petition. Certainly, Your Honor, and I believe this came up with my counterpart. I think it's certainly number one. Yeah. It may have varied to number two as the proceedings went forward, but it's certainly not number three. I don't see number three anywhere in the petition. Yeah, as Your Honor pointed out, it's certainly not there. And so the question then becomes, would a person of ordinary skill in the art looking at Numazaki infer or see that that term, which we don't understand, actually means cellular phone, and there's simply no evidence for that? There's no evidence in the article? There's no evidence for it, and it was in its infancy at the time, and, I mean, this is a substantial evidence standard of review, and I think it's a dumb argument. You have a lot of different arguments. If you'd like to continue with this one, you feel free. If you want to move on to a different one, you feel free. I'd love to move on, Your Honor. I would just also point out that to the extent there's any weight given to the argument about bandwidth and cost concerns, Dr. Bederson himself actually conceded that those concerns would also apply to both a Wi-Fi or a wired implementation in his declaration. What I'd like to move on then to, Your Honor, is a related issue that, again, is coming up because of unified patents and how these different parties interact. It is our position that from a procedural standpoint, Apple does not have standing to appeal the final written decision as claims 11 and 13, and it's that relationship, whether it be real party and interest or personal. Well, there's two different questions. One is standing and one is possibly real party and interest. I mean, you've sued Apple, so they've got standing as far as I'm concerned. That's Article III. They're at risk. You've sued them. So put standing aside. What you mean is the real party and interest issue, and I think you've waived it. So tell me why you haven't waived it. We haven't waived it, Your Honor, because of we are bringing it up within the context of no standing. You're bringing it up on appeal. You never raised it before the board. Right, and we couldn't have because of the Shark Ninja presidential opinion before the board. I think what patents— Because of the—I'm sorry, I didn't hear you. I'm sorry, Your Honor. It's the Shark Ninja presidential opinion. We raised it in our briefing. And essentially what it says is for a period of time, patent owners would raise real party and interest and failure to identify all real parties and interests as a ground for dismissing an IPO. You've called our case law like a coup stick, which holds that, you know, real party and interest inquiries are waived when the arguments aren't presented to the board. That's why, Your Honor, we're moving to—that's why our argument is based on the lack of standing. But UNIFI came out, and you had at least a week before this opinion came out by the board. And so you could have gone in and asked and advised the board, look, we've got this other opinion. There's an issue of real party and interest. You shouldn't move forward on issuing this case. And from what I can see from the record, as the chief pointed out, you didn't do that. That's correct, Your Honor. But it's still our position that Apple lacks standing under this court's decision in Boeing— How can you say Apple lacks standing? They've got injury in fact. You sued them. How can you say they lack standing? Standing is a constitutional concept. They've got injury in fact. Because 315E1—under 315E1, they cannot continue to—continue with the IPR that they filed. So you're not arguing Article 3 standing. You're arguing some sort of statutory standing argument that you could have made in the agency. It's our position that we could not have made it before the agency with respect to standing because the PTAB doesn't determine whether they have standing to appeal PTAB decisions to this court. Do you mind speaking up just a tad? I'm sorry. I mean, I really do, but I think it'll be easier if you just speak up a little bit more. Certainly, Your Honor. The statute says 315E1 talks about their ability to maintain a proceeding before the office. It doesn't talk about appeals. So I don't understand why that's an answer to why you didn't bring it to the attention of the board in a timely fashion. I think that would apply to if we were asking this court to terminate the Apple IPR or order the PTAB to terminate the Apple IPR. But here we're saying that because of 315E1 and the estoppel provision there that Apple no longer has standing here under the court's decision in Boeing versus the Commissioner of Patents and Trademarks. What about what court decision in Boeing and what do you think it stands for? Your Honor, it's Boeing Company versus Commissioner of Patents, 853 Federal 2nd 878. And what do you think it tells us? I mean, I just know that all of our standing cases in these IPRs are about people who weren't sued, right? That's the nature of the standing cases that we have. It's, oh, goodness, you filed an IPR, but you weren't sued, so you have no injury in effect. And we say, that's true if you weren't sued. But when you are sued, you actually have injury in effect. So I don't, I mean, you're talking about a statutory provision. That seems waivable. My apologies, Your Honor. I cited to Boeing just for the proposition that standing can't be waived. Okay. It was actually the intuitive surgical decision. There's Ethicon 25 Federal 4th, page 1035, and the pin site is 1043. The quote is, once 315E1 prohibits the petitioner slash RPI slash privy from maintaining an IPR, the petitioner RPI privy ceases to be a party under Section 141, 319, placing it outside the zone of interest established by the congressionally authorized right to appeal in those provisions. Well, yeah, I totally get that. The problem is, you didn't argue 315 to the board, and therefore, we don't know if Apple ceases to be, or is a real party in interest. Anyway, why don't you move on? You've got a lot of other issues. Can I ask you just one more question on that? What is your view about the impact of what you're asking for? So you're saying as a consequence of how you're reading the statute, Apple can't proceed with its appeal. But you can appeal, you can continue to proceed with your cross-appeal? I think it would. Or does it undo the entire IPR if they were a real party in interest, which nobody's adjudicated yet? The request of relief here would be limited to claims 11 and 13. Okay, okay. Can I ask you one other technical question, which is, I think I recall that in gray, you were making arguments with respect to this issue of estoppel standing, whatever we want to call it. This isn't part of your cross-appeal, right? This is part of your response to the main appeal. Am I understanding the way this case is going down? I believe that's right. And so therefore, under our rules of briefing, you would not be able to, in your gray brief, in this case, in your gray brief, you're confined to the issues raised in the cross-appeal. So those arguments made in gray with respect to the main appeal are not properly raised in the final brief, right? I think we raised the issue in our opening brief. Well, of course you did, but your opening brief is both a response and a cross-appeal. But these are issues that go not to the cross-appeal, but rather than the response. So I think the notion is kind of like, remember how I reminded you in the last case, you're coming up on rebuttal, you can only address the issues that were raised. It's a similar thing. In a gray brief, when you have a cross-appeal, you can only address the cross-appeal. You can't address the other. I don't remember the precise what you did in the issues, but I think there were arguments made with respect to this estoppel standing issue in gray. So you appreciate that that is likely improper. Certainly, Your Honor. I'm going to let you move on. I'm going to say one more thing. Whether somebody is a real party in interest to the question of fact, I don't get to make questions of fact or decide them. That's another reason why it's waived, if not waived, before the Board. Because I can't decide a question of fact in the first instance. Only the Board can, then I can review those questions of fact. So anyway, go ahead. Were you asking for a remand on that? I think, Your Honor, one of the issues that patent owners run into is this sort of limbo we're in with respect to the timing of when Unified will file patents, as well as its members, and when the estoppel attaches, typically after final written decisions. Well, here it seems pretty clear. I mean, you had a final decision in one case. You had a pending proceeding in the other. You run into the Board and you said, hey, look at 315E. You should stop what you're doing now. Right? That's how I read this, what I read the statute is contemplating. Right? And you didn't do that here. We didn't do it here. We've also been turned down in similar circumstances. Your Honors, with respect to the remaining arguments, the grounds are very similar between the two petitions. They're both based on Numizaki. So if the Board has any questions about any of that. So what happened, just as a logistical matter, if we were to hypothetically affirm the first case, does that take care of the cross appeal in this case? So in the first case, claims 11 and 13 are not an issue because Unified does not have standing to appeal them. So those stand. 11 and 13 are part of the main appeal, right? I asked about the cross appeal, not the main appeal. Maybe I'm confused. I'm sorry. I thought you were referring to that. No, I was referring to the cross appeal. What issues are left in the cross appeal if we were to hypothetically affirm in the case we just heard? The remainder would be there, Your Honor. It's the prior art determinations of the Board based on Numizaki for the primary claims. If we were to affirm the claims, we would affirm one, the claims are gone. So what's left? Are there any claims left in your cross appeal that wouldn't be covered by the first appeal? I don't know the answer to this. I'm asking you. So the first appeal is claims 11 and 13. And then this appeal is? I'm not talking about the prior. Your answer to her question is claims 1 and 14. Your answer to her question should be claims 1 and 14. This case involves 1, 7, 12, and 14. The last one involves 7 through 13. So therefore, it doesn't involve 1 and 14. That should be your answer to Judge Parsons. Okay, thank you. Your time is up. Let's hear from Ms. Foster on rebuttal. Two points briefly, Your Honors, and I won't address the cross appeal in substance because my opponent did not. So I believe this will be the final piece of this argument. First, on the merits of claims 11 and 13, on the issue of the word necessarily at Appendix 1135, I want to clear up how Dr. Bederson was using that term. That was, if you have a cellular phone, it necessarily uses a cellular transceiver.   Not that Numizaki necessarily discloses a cellular phone. And recall that at this point, I want to correct a slight misstatement by the other side. Claim 13 was instituted on. Gesture Technology did not challenge that in its preliminary patent owner response, and the Board found we had established a reasonable likelihood of showing that Numizaki rendered obvious a cellular phone. The issue was just about the means for transmitting in that cellular phone as to Claim 11. Turning to the issue of what we're calling standing but which is, in fact, an estoppel issue, Chief Judge Moore, you're correct. It's a question of fact that this Court reviews for substantial evidence. It's also a question on which the patent owner bears the burden of production, which this Court has held in AIT and Vernetics, for example. They have the obligation to bring this up to the Board. There is mention of Shark Ninja. That's actually not addressed in our briefing in this case, so I'm not familiar with that particular decision. What I am familiar with is, for example, the argument that Gesture Technology made in this case, at Appendix 224 to 226, it argued that the Board should exercise its discretion to deny institution under 314D, and the basis for that argument was Apple is a dues-paying member of Unified Patents. The idea that they can now say we didn't know the basis for our estoppel argument, which is the exact same basis, Apple is a dues-paying member of Unified Patents, is simply implausible, even if the Court were to consider it despite it being raised in their gray brief at a procedurally improper point. I want to also, again, I don't have the Shark Ninja case, but what I do have is the MemoryWeb v. Apple case that is cited in our reply brief. That's instructive as to how the Board would, in fact, view this procedural question of forfeiture. In that case, recall there had been the MemoryWeb Unified decision where there was initially a finding of real party and interest that was later vacated by the Director. The patent owner in that case raised an estoppel argument after the hearing in that case, and the Board said that was too late, that it had an obligation to raise it in its patent owner response, and the response was, well, the final written decision that we think forms the basis for estoppel hasn't issued yet. The Board said that doesn't matter. You knew that that proceeding was going on. You should have put the parties and the Board here on notice that this could be an issue, among other reasons, so that we could align the timing and prevent any estoppel from happening in the first place. But this case went even further than that because here they already had the decision, and they didn't go back to the Board in the other proceeding. I believe the timing is such that this case was on a field that I apologize. I've gotten confused with the timing. They certainly waited longer in this case. If they didn't raise it until they were on appeal, they never even tried to raise it at the Board, and for that reason it's clearly forfeited. If I may briefly make a point, the intuitive case footnote 8 recognizes the difference between constitutional and statutory standing. Okay. She did not address the cross-appeal, so there is no rebuttal, and besides, her time has expired anyway, so this case is taken under submission. Thank you both.